OPINION OF THE COURT
Titone, J.
In this dispute over occupancy rights to a rent-controlled *206 apartment, the central question to be resolved on this request for preliminary injunctive relief (see, CPLR 6301) is whether appellant has demonstrated a likelihood of success on the merits (see, Grant Co. v Srogi, 52 NY2d 496, 517) by showing that, as a matter of law, he is entitled to seek protection from eviction under New York City Rent and Eviction Regulations 9 NYCRR 2204.6 (d) (formerly New York City Rent and Eviction Regulations §56 [d]). That regulation provides that upon the death of a rent-control tenant, the landlord may not dispossess "either the surviving spouse of the deceased tenant or some other member of the deceased tenant’s family who has been living with the tenant” (emphasis supplied). Resolution of this question requires this court to determine the meaning of the term "family” as it is used in this context.
I.
Appellant, Miguel Braschi, was living with Leslie Blanchard in a rent-controlled apartment located at 405 East 54th Street from the summer of 1975 until Blanchard’s death in September of 1986. In November of 1986, respondent, Stahl Associates Company, the owner of the apartment building, served a notice to cure on appellant contending that he was a mere licensee with no right to occupy the apartment since only Blanchard was the tenant of record. In December of 1986 respondent served appellant with a notice to terminate informing appellant that he had one month to vacate the apartment and that, if the apartment was not vacated, respondent would commence summary proceedings to evict him.
Appellant then initiated an action seeking a permanent injunction and a declaration of entitlement to occupy the apartment. By order to show cause appellant then moved for a preliminary injunction, pendente lite, enjoining respondent from evicting him until a court could determine whether he was a member of Blanchard’s family within the meaning of 9 NYCRR 2204.6 (d). After examining the nature of the relationship between the two men, Supreme Court concluded that appellant was a "family member” within the meaning of the regulation and, accordingly, that a preliminary injunction should be issued. The court based this decision on its finding that the long-term interdependent nature of the 10-year relationship between appellant and Blanchard "fulfills any definitional criteria of the term 'family.’ ”
The Appellate Division reversed, concluding that section *207 2204.6 (d) provides noneviction protection only to "family members within traditional, legally recognized familial relationships” (143 AD2d 44, 45). Since appellant’s and Blanchard’s relationship was not one given formal recognition by the law, the court held that appellant could not seek the protection of the noneviction ordinance. After denying the motion for preliminary injunctive relief, the Appellate Division granted leave to appeal to this court, certifying the following question of law: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?” We now reverse.
II.
As a threshold matter, although the determination of an application for a provisional remedy such as a preliminary injunction ordinarily involves the exercise of discretion, the denial of such relief presents a question of law reviewable by this court on an appeal brought pursuant to CPLR 5713 when "the Appellate Division denies [the] relief on an issue of law alone, and makes clear that no question of fact or discretion entered into its decision” (Herzog Bros. Trucking v State Tax Commn., 69 NY2d 536, 540-541, vacated 487 US —, 108 S Ct 2861, on remand 72 NY2d 720; see, Cohen and Karger, Powers of the New York Court of Appeals § 88, at 377 [rev ed]; Public Adm’r of County of N. Y. v Royal Bank, 19 NY2d 127, 129-130). Here, the Appellate Division’s determination rested solely on its conclusion that as a matter of law appellant could not seek noneviction protection because of the absence of a "legally recognized” relationship with Blanchard. Consequently, appellant’s appeal may be entertained, and we may review the central question presented: whether, on his motion for a preliminary injunction, appellant failed to establish, as a matter of law, the requisite clear likelihood of success on the merits of his claim to the protection from eviction provided by section 2204.6 (d).
III.
It is fundamental that in construing the words of a statute "[t]he legislative intent is the great and controlling principle” (People v Ryan, 274 NY 149, 152; see, Ferres v City of New Rochelle, 68 NY2d 446, 451; Matter of Petterson v Daystrom Corp., 17 NY2d 32, 38). Indeed, "the general purpose is a more important aid to the meaning than any rule which grammar *208 or formal logic may lay down” (United States v Whitridge, 197 US 135, 143). Statutes are ordinarily interpreted so as to avoid objectionable consequences and to prevent hardship or injustice (see, Zappone v Home Ins. Co., 55 NY2d 131; Matter of Petterson v Daystrom Corp., 17 NY2d 32, 38, supra; McKinney’s Cons Laws of NY, Book 1, Statutes §§ 141, 143, 146). Hence, where doubt exists as to the meaning of a term, and a choice between two constructions is afforded, the consequences that may result from the different interpretations should be considered (see, Matter of Town Smithtown v Moore, 11 NY2d 238, 244; People v Ryan, 274 NY 149, 152, supra). In addition, since rent-control laws are remedial in nature and designed to promote the public good, their provisions should be interpreted broadly to effectuate their purposes (see, Matter of Park W. Vil. v Lewis, 62 NY2d 431, 436-437; Matter of Sommer v New York City Conciliation & Appeals Bd., 93 AD2d 481, affd 61 NY2d 973; McKinney’s Cons Law of NY, Book 1, Statutes § 341). Finally, where a problem as to the meaning of a given term arises, a court’s role is not to delve into the minds of legislators, but rather to effectuate the statute by carrying out the purpose of the statute as it is embodied in the words chosen by the Legislature (see, Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum L Rev 527, 538-540).
The present dispute arises because the term "family” is not defined in the rent-control code and the legislative history is devoid of any specific reference to the noneviction provision. All that is known is the legislative purpose underlying the enactment of the rent-control laws as a whole.
Rent control was enacted to address a "serious public emergency” created by "an acute shortage in dwellings,” which resulted in "speculative, unwarranted and abnormal increases in rents” (L 1946 ch 274, codified, as amended, at McKinney’s Uncons Laws of NY § 8581 et seq). These measures were designed to regulate and control the housing market so as to "prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health * * * [and] to prevent uncertainty, hardship and dislocation” (id.). Although initially designed as an emergency measure to alleviate the housing shortage attributable to the end of World War II, "a serious public emergency continues to exist in the housing of a considerable number of persons” (id.). Consequently, the Legislature has found it necessary to continually reenact the rent- *209 control laws, thereby providing continued protection to tenants.
To accomplish its goals, the Legislature recognized that not only would rents have to be controlled, but that evictions would have to be regulated and controlled as well (id.). Hence, section 2204.6 of the New York City Rent and Eviction Regulations (9 NYCRR 2204.6), which authorizes the issuance of a certificate for the eviction of persons occupying a rent-controlled apartment after the death of the named tenant, provides, in subdivision (d), noneviction protection to those occupants who are either the "surviving spouse of the deceased tenant or some other member of the deceased tenant’s family who has been living with the tenant [of record]” (emphasis supplied). The manifest intent of this section is to restrict the landowners’ ability to evict a narrow class of occupants other than the tenant of record. The question presented here concerns the scope of the protections provided. Juxtaposed against this intent favoring the protection of tenants, is the over-all objective of a gradual "transition from regulation to a normal market of free bargaining between landlord and tenant” (see, e.g., Administrative Code of City of New York § 26-401). One way in which this goal is to be achieved is "vacancy decontrol,” which automatically makes rent-control units subject to the less rigorous provisions of rent stabilization upon the termination of the rent-control tenancy (9 NYCRR 2520.11 [a]; 2521.1 [a] [1]).
Emphasizing the latter objective, respondent argues that the term "family member” as used in 9 NYCRR 2204.6 (d) should be construed, consistent with this State’s intestacy laws, to mean relationships of blood, consanguinity and adoption in order to effectuate the over-all goal of orderly succession to real property. Under this interpretation, only those entitled to inherit under the laws of intestacy would be afforded noneviction protection (see, EPTL 4-1.1). Further, as did the Appellate Division, respondent relies on our decision in Matter of Robert Paul P. (63 NY2d 233), arguing that since the relationship between appellant and Blanchard has not been accorded legal status by the Legislature, it is not entitled to the protections of section 2204.6 (d), which, according to the Appellate Division, applies only to "family members within traditional, legally recognized familial relationships” (143 AD2d 44, 45). Finally, respondent contends that our construction of the term "family member” should be guided by the recently enacted noneviction provision of the Rent Stabilization Code (9 *210 NYCRR 2523.5 [a], [b] [1], [2]), which was passed in response to our decision in Sullivan v Brevard Assocs. (66 NY2d 489), and specifically enumerates the individuals who are entitled to noneviction protection under the listed circumstances (9 NYCRR 2520.6 [o]).
However, as we have continually noted, the rent-stabilization system is different from the rent-control system in that the former is a less onerous burden on the property owner, and thus the provisions of one cannot simply be imported into the other (Sullivan v Brevard Assocs., 66 NY2d 489, 494, supra; see, 8200 Realty Corp. v Lindsay, 27 NY2d 124, 136-137). Respondent’s reliance on Matter of Robert Paul P. (supra) is also misplaced, since that case, which held that one adult cannot adopt another where none of the incidents of a filial relationship is evidenced or even remotely intended, was based solely on the purposes of the adoption laws (see, Domestic Relations Law § 110) and has no bearing on the proper interpretation of a provision in the rent-control laws.
We also reject respondent’s argument that the purpose of the noneviction provision of the rent-control laws is to control the orderly succession to real property in a manner similar to that which occurs under our State’s intestacy laws (EPTL 4-1.1, 4-1.2). The noneviction provision does not concern succession to real property but rather is a means of protecting a certain class of occupants from the sudden loss of their homes. The regulation does not create an alienable property right that could be sold, assigned or otherwise disposed of and, hence, need not be construed as coextensive with the intestacy laws. Moreover, such a construction would be inconsistent with the purposes of the rent-control system as a whole, since it would afford protection to distant blood relatives who actually had but a superficial relationship with the deceased tenant while denying that protection to unmarried lifetime partners.
Finally, the dissent’s reliance on Hudson View Props. v Weiss (59 NY2d 733) is misplaced. In that case we permitted the eviction of an unrelated occupant from a rent-controlled apartment under a lease explicitly restricting occupancy to "immediate family”. However, the tenant in Hudson View conceded "that an individual not part of her immediate family” occupied the apartment (id., at 735), and, thus, the sole question before us was whether enforcement of the lease provision was violative of the State or City Human Rights *211 Law. Whether respondent tenant was, in fact, an "immediate family” member was neither specifically addressed nor implicitly answered (see, dissenting opn, at 220).
Contrary to all of these arguments, we conclude that the term family, as used in 9 NYCRR 2204.6 (d), should not be rigidly restricted to those people who have formalized their relationship by obtaining, for instance, a marriage certificate or an adoption order. The intended protection against sudden eviction should not rest on fictitious legal distinctions or genetic history, but instead should find its foundation in the reality of family life. In the context of eviction, a more realistic, and certainly equally valid, view of a family includes two adult lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence. This view comports both with our society’s traditional concept of "family” and with the expectations of individuals who live in such nuclear units (see also, 829 Seventh Ave. Co. v Reider, 67 NY2d 930, 931-932 [interpreting 9 NYCRR 2204.6 (d)’s additional "living with” requirement to mean living with the named tenant "in a family unit, which in turn connotes an arrangement, whatever its duration, bearing some indicia of permanence or continuity” (emphasis supplied)]).[1] In fact, Webster’s Dictionary defines "family” first as "a group of people united by certain convictions or common affiliation” (Webster’s Ninth New Collegiate Dictionary 448 [1984]; see, Ballantine’s Law Dictionary 456 [3d ed 1969] ["family” defined as "(p)rimarily, the collective body of persons who live in one house and under one head or management”]; Black’s Law Dictionary 543 [Special Deluxe 5th ed 1979]). Hence, it is reasonable to conclude that, in using the term "family,” the Legislature intended to extend protection to those who reside in households having all of the normal familial characteristics.[2] Appellant Braschi should therefore be afforded the opportunity to prove that he and Blanchard had such a household.
*212 This definition of "family” is consistent with both of the competing purposes of the rent-control laws: the protection of individuals from sudden dislocation and the gradual transition to a free market system. Family members, whether or not related by blood, or law who have always treated the apartment as their family home will be protected against the hardship of eviction following the death of the named tenant, thereby furthering the Legislature’s goals of preventing dislocation and preserving family units which might otherwise be broken apart upon eviction.[3] This approach will foster the transition from rent control to rent stabilization by drawing a distinction between those individuals who are, in fact, genuine family members, and those who are mere roommates (see, Real Property Law § 235-f; Yorkshire Towers Co. v Harpster, 134 Misc 2d 384) or newly discovered relatives hoping to inherit the rent-controlled apartment after the existing tenant’s death.[4]
The determination as to whether an individual is entitled to noneviction protection should be based upon an objective examination of the relationship of the parties. In making this assessment, the lower courts of this State have looked to a number of factors, including the exclusivity and longevity of the relationship, the level of emotional and financial commitment, the manner in which the parties have conducted their everyday lives and held themselves out to society, and the *213 reliance placed upon one another for daily family services (see, e.g., Athineos v Thayer, NYLJ, Mar. 25, 1987, at 14, col 4 [Civ Ct, Kings County], affd NYLJ, Feb. 9, 1988, at 15, col 4 [App Term, 2d Dept] [orphan never formally adopted but lived in family home for 34 years]; 2-4 Realty Assocs. v Pittman, 137 Misc 2d 898, 902 [two men living in a "father-son” relationship for 25 years]; Zimmerman v Burton, 107 Misc 2d 401, 404 [unmarried heterosexual life partner]; Rutar Co. v Yoshito, No. 53042/79 [Civ Ct, NY County][unmarried heterosexual life partner]; Gelman v Castaneda, NYLJ, Oct. 22, 1986, at 13, col 1 [Civ Ct, NY County] [male life partners]). These factors are most helpful, although it should be emphasized that the presence or absence of one or more of them is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis, control. Appellant’s situation provides an example of how the rule should be applied.
Appellant and Blanchard lived together as permanent life partners for more than 10 years. They regarded one another, and were regarded by friends and family, as spouses. The two men’s families were aware of the nature of the relationship, and they regularly visited each other’s families and attended family functions together, as a couple. Even today, appellant continues to maintain a relationship with Blanchard’s niece, who considers him an uncle.
In addition to their interwoven social lives, appellant clearly considered the apartment his home. He lists the apartment as his address oh his driver’s license and passport, and receives all his mail at the apartment address. Moreover, appellant’s tenancy was known to the building’s superintendent and doormen, who viewed the two men as a couple.
Financially, the two men shared all obligations including a household budget. The two were authorized signatories of three safe-deposit boxes, they maintained joint checking and savings accounts, and joint credit cards. In fact, rent was often paid with a check from their joint checking account. Additionally, Blanchard executed a power of attorney in appellant’s favor so that appellant could make necessary decisions — financial, medical and personal — for him during his illness. Finally, appellant was the named beneficiary of Blanchard’s life insurance policy, as well as the primary legatee and coexecutor of Blanchard’s estate. Hence, a court examining these facts could reasonably conclude that these men were much more than mere roommates.
*214 Inasmuch as this case is before us on a certified question, we conclude only that appellant has demonstrated a likelihood of success on the merits, in that he is not excluded, as a matter of law, from seeking noneviction protection. Since all remaining issues are beyond this court’s scope of review, we remit this case to the Appellate Division so that it may exercise its discretionary powers in accordance with this decision.
Accordingly, the order of the Appellate Division should be reversed and the case remitted to that court for a consideration of undetermined questions. The certified question should be answered in the negative.

. Although the dissent suggests that our interpretation of "family” indefinitely expands the protections provided by section 2204.6 (d) (dissenting opn, at 216), its own proposed standard — legally recognized relationships based on blood, marriage or adoption — may cast an even wider net, since the number of blood relations an individual has will usually exceed the number of people who would qualify by our standard.

. We note that the concurrer apparently agrees with our view of the purposes of the noneviction ordinance (concurring opn, at 215), and the impact this purpose should have on the way in which this and future cases should be decided.

. We note, however, that the definition of family that we adopt here for purposes of the noneviction protection of the rent-control laws is completely unrelated to the concept of "functional family,” as that term has developed under this court’s decisions in the context of zoning ordinances (see, Baer v Town of Brookhaven, 73 NY2d 942; McMinn v Town of Oyster Bay, 66 NY2d 544; Group House v Board of Zoning & Appeals, 45 NY2d 266). Those decisions focus on a locality’s power to use its zoning powers in such a way as to impinge upon an individual’s ability to live under the same roof with another individual. They have absolutely no bearing on the scope of non-eviction protection provided by section 2204.6 (d).

. Also unpersuasive is the dissent’s interpretation of the "roommate” law which was passed in response to our decision in Hudson View Props. v Weiss (59 NY2d 733). That statute allows roommates to live with the named tenant by making lease provisions to the contrary void as against public policy (Real Property Law § 235-f [2]). The law also provides that "occupant’s” (roommates) do not automatically acquire "any right to continued occupancy in the event that the tenant vacates the premises” (§ 235-f [6]). Occupant is defined as "a person, other than a tenant or a member of a tenant’s immediate family” (§ 235-f [1] [b]). However, contrary to the dissent’s assumption that this law contemplates a distinction between related and unrelated individuals, no such distinction is apparent from the Legislature’s unexplained use of the term "immediate family.”