| |
|---|
| **Kanter's Realty Assoc. LLC v Trujillo** |
| 2025 NY Slip Op 30120(U) |
| January 15, 2025 |
| Civil Court of the City of New York, New York County |
| Docket Number: L & T Index No. 59129/17 |
| Judge: Norma J. Jennings |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART S
_____X

KANTER'S REALTY ASSOCIATES LLC,

                          L & T Index #59129/17

                    Petitioner,                DECISION AFTER TRIAL

        -against-

ANA RIOS TRUJILLO, A/K/A ANA L. RIOS,

                  Respondent-Tenant

CARLOS F. ROJAS TRUJILLO,

                  Respondent-Undertenats.

_____X

**HON. NORMA J. JENNINGS:**

Petitioner commenced this nonprimary residence holdover proceeding in April 2017 to recover possession of apartment 5R, located at 517 East 83rd Street, New York, New York, from the rent-controlled tenant of record, Ana Rios, and respondent undertenant, Carols F. Rojas Trujillo, on the ground that Ana Rios was not occupying the subject premises as her primary residence. On May 10, 2017, counsel interposed an answer on behalf of both respondents wherein respondent Ana Rios denied the allegations in the petition, and respondent-undertenant Carlos F. Rojas Trujillo, in the alternative, asserted an affirmative defense of succession. Thereafter, respondents retained separate counsel, and Northern Manhattan Improvement Corporation ("NMIC") appeared for Ana Rios, and Housing Conservation Coordinators ("HCC") appeared for respondent-undertenant Carolos F. Trujillo. On August 21, 2018 the court appointed a Guardian Ad Litem for Mr. Trujillo.

The proceeding was marked off calendar for the parties to conduct discovery, including the depositions of both respondents. On June 4, 2021, respondent Ana Rios passed away in Bogota, Colombia, and in November 2021, NMIC filed an order to show cause to be relieved as counsel. On November 6, 2021, the Hon. Evon M. Asforis, granted NMIC's motion to be relieved as counsel for Ms. Rios. HCC continued as counsel for Carlos F. Rojas Trujillo, the court conferenced the case several times.

On March 21, 2023, the trial commenced, and the petitioner called one witness, Ronald Schwartz, the managing agent for the subject premises. Mr. Schwartz testified the premises is a five-story walk-up with three apartments on each floor and Ana Rios was the rent-controlled tenant of Apartment 5R. Petitioner introduced into evidence, the stipulation of facts and the deposition of Ana Rios (P1); Ana Rios's death certificate (P2); a certificate of good standing (P3); the certified deed for the subject premises (P4); the certified multiple dwelling registration (P5); and the DHCR rent roll (P6). The court also took judicial notice of the court file. Petitioner rested without calling any further witnesses.

Counsel for the respondent made an oral application for a directed verdict and then moved, pursuant to CPLR sections 4401, 5016, and 3211(a)(2) and RPAPL 741(a)(7), for a directed verdict dismissing the

1

[* 1]

petition based upon petitioner's failure to prove its *prima facie* case that the subject premises were not Ms. Rios' primary residence. Respondent also moved to dismiss, pursuant to CPLR 1015(a) and CPLR 5016(d), on the ground that Ms. Rios' death divested the court of subject matter jurisdiction and that the proceeding should be dismissed because it was brought against Ana Rios on the grounds that she was not occupying the premises as her primary residence, and upon her death, there was no remaining cause of action.

In opposition, petitioner argued that the respondent's claim that the court lacked subject matter jurisdiction was without merit and Mr. Trujillo was named, served, appeared by counsel, and filed an answer interposing an affirmative defense of succession. Petitioner further argued that it proved at trial that there was no lease for the premises as Ms. Rios was a rent-controlled tenant and that upon her death, any right to possession terminated, and petitioner was automatically entitled to possession against Ms. Rios.

By decision and order dated June 30, 2023, this court denied respondent's motion, holding that Ms. Rios was the rent-controlled tenant of the subject premises and did not have a lease in effect when the proceeding commenced. Therefore, there was no requirement that her estate be substituted as a party in this proceeding, as any right to possession by her terminated and automatically reverted to petitioner upon her death. This court further held that it was also unnecessary to substitute Mr. Trujilo as a party because he had already been named and served as a party, and he interposed an answer raising an affirmative defense of succession. The court then restored the proceeding to the calendar for a continued trial on Mr. Trujillo's succession claim.

The court continued the trial on respondent's succession claim on October 16, 2023, April 25, 2024, June 26, 2024, September 10, 2024, September 12, 2024, October 8, 2024, October 21, 2024, and October 30, 2024 and adjourned to December 5, 2024 for submission of post-trial memorandums of law.

**RESPONDENT'S CASE:**

**TESTIMONY OF MICHAEL BEDELL:**

Mr. Bedell testified that he had known Ms. Rios and Mr. Trujillo since 2013 and was their original attorney, who filed the respondents answer in this proceeding. However, Mr. Bedell did not recall how often he had seen them together, and believed Ms. Rios was financially dependent on Mr. Trujillo and their finances were intertwined. Mr. Bedell further testified respondents retained him to represent them jointly in this proceeding. On cross-examination, Mr. Bedell testified he did not know how often he met with Ms. Rios and Mr. Trujillo, but he represented them jointly and filed an answer on their behalf in 2018.

**TESTIMONY OF FATHER TIMOTHY PATRICK DORE:**

Father Timothy Dore testified that he has been a Catholic priest for 31 years and worked at Most Holy Trinity Church in Brooklyn from 2004 to 2014 where he met Mr. Trujillo, whom he referred to as Fernando who was an organist at the church. Mr. Trujillo introduced him to Ms. Rios, his aunt, at the same time. Father Dore testified that Fernando and Ms. Rios would come to church together about once a month, and Ms. Rios would sit and listen to Fernando play the organ. After church, the three would sometimes go to the house and have coffee, and Fernando would give him voice lessons. On cross-

2

[* 2]

examination, Father Dore stated that the last time he saw Ms. Rios was in 2014, and he believed that Ms. Rios was Fernando's aunt because Fernando introduced her to him that way.

**TESTIMONY OF DR. ESTELLE IRENE YOUNG:**

Dr. Young testified that she has lived on the first floor of the subject premises for sixty-five years and can see the stoop from her window. She said she was friendly with Ms. Rios, who moved into her apartment in 1987 and lived there for 36 years. Dr. Young did not recall the year she met Mr. Trujillo, whom she referred to as Fernando, but her mom died in 2011, and it was before her mother's death. Dr. Young further testified from 2011 to 2021, she would see Fernando and Ms. Rios once or twice a week and the three of them would have tea and coffee, engage in casual conversations, and listen to music together in the apartment. Dr. Young testified that Ms. Rios and Fernando would often talk about music, but Ms. Rios spoke to Fernando in Spanish because she was not fluent in English. Dr. Young stated that she visited Fernando and Ms. Rios in their apartment, they did not come to her apartment and from 2016 to 2021 she did not visit as frequently about every two to three weeks and then every two to three months.

Dr. Young testified the apartment consisted of the kitchen, a small room where Ms. Rios slept, the living room, the larger bedroom where Fernando slept, and a bathroom off the kitchen. Ms. Young testified Ms. Rios and Fernando lived together and she observed Ms. Rios belongings in the apartment, and Fernando's piano and keyboard were also in the apartment. Dr. Young stated that Fernando and Ms. Rios would go out together in the neighborhood for lunch, church, and attend concerts at Rockefeller University. She observed Ms. Rios had difficulty with the stairs and often saw Fernando assisting her up the stairs. Ms. Rios also shared that she was very anxious about her legal matters. Dr. Young described Mr. Trujillo's and Ms. Rios' relationship as that of an aunt and nephew, very caring, loving, and tender, and said that he grieved and missed his aunt.

On cross-examination, Dr. Young testified that she forgot if she spoke to her other neighbors in her building because of her age but recalled she spoke to Ms. Rios and Fernando at least once or twice a week, but sometimes, Ms. Rios traveled, and she traveled for months at a time as well. Dr. Young stated that last time she saw Fernando and Ms. Rios in their apartment together was in June to show a painting, and Fernando was a guest of hers at a concert.

**TESTIMONY OF LYUBA SHCHYBCHYK:**

Lyuba Shchybchyk testified that she is a former opera singer and voice teacher and now plays and sings at Ozone Park Church. Ms. Shchybchyk met Mr. Trujillo at an opera class in 1999 and Ms. Rios, whom she called Leticia, in 2008. Ms. Shchybchyk could not recall the apartment number of the premises, but she would take the Q train there, and the building was a walk-up. From 2010 to 2015, Ms. Shchybchyk testified once a week she would give Fernando voice lessons in the apartment and Ms. Rios would be there and would often offer her tea and food. Fernando had his piano and television in the apartment and stayed in the small bedroom where he had a table and furniture. Ms. Shchybchyk further testified from 2015 to 2020, she visited the respondents in the apartment less frequently and since Covid she has not visited the apartment. Ms. Shchybchk said her visits would usually last an hour and a half but sometimes would stay after the lesson. She also knew Fernando's wife, Maryna, who at one point lived there with Fernando and Leticia, and they would ask her to stay, or Fernando would take them to lunch or the park. Ms. Shchybchyk testified sometimes Leticia traveled and was not there, but usually home when she

3

[* 3]

visited. Ms. Shchybchyk described Ms. Rios and Mr. Trijullo's relationship as loving, caring, they never argued and treated each other very well.

On cross-examination, Ms. Shchybchyk testified that she gave Fernando voice lessons from 2008 through 2015 and was in the apartment twenty to thirty times and after 2015, less than once a month. Ms. Shchybchyk stated when she started giving Fernando voice lessons, Leticia was in the apartment, but after 2010, Leticia was not there as often. When petitioner's attorney asked her to confirm if, after 2010, Leticia was there, Ms. Shchybchyk answered that Leticia probably was not there.

### TESTIMONY ENRIQUE CHAMON PENA:

Mr. Pena testified that he works at Charly Mon, a restaurant between 83rd and 84th Street on York Avenue. He met Fernando in 2007 and from 2007 through 2012 and from 2012 through 2020 until the pandemic, he would bring food and run errands three times a week for Ms. Letty which is what he called Ms. Rios, and Mr. Trujillo who he called Fernando. Mr. Pena testified from 2007 through 2012 he often saw Fernando and Ms. Letty together in the apartment, at Mr. Kim's Korean Grocery Time, or just walking around the neighborhood. Mr. Pena testified Ms. Letty and Fernando, with whom he became friends, got along very well, and had a good relationship, and Ms. Letty told him that Fernando was her nephew. Mr. Pena further testified he believed Ms. Letty and Fernando lived together because they both were in the apartment when he visited. Mr. Pena said that he stopped working for three months in April 2020 because he contracted COVID and never went back to the apartment.

On cross-examination, Mr. Pena testified he did not see Letty for one month in 2017 and would stay in the apartment no more than twenty minutes when delivering food and an hour when running errands.

### TESTIMONY OF GABRIEL RIOS TRUJILLO:

Mr. Rios testified that he has lived on East 92nd Street since 1997. Ms. Rios, or Leticia, was his older sister, and Fernando is his nephew who moved into the apartment in 2005 to help Leticia because she lived alone and had no children. Mr. Rios testified from 2010 through 2015, he would visit Leticia and Fernando at the apartment and stay some nights because it would be too late for him to go home. When he stayed in, Mr. the subject apartment, Mr. Rios testified, he would sleep on the couch, and Leticia stayed in the small bedroom where she kept her clothing, a radio, bed, and other belongings. In 2005, Fernando moved to Leticia's room, and she moved to the living room. Mr. Rios testified that Leticia would cook for them, sometimes they would go out to eat, go to church to hear Fernando sing, celebrate holidays, and went to Brooklyn about five times to watch Fernando perform as a singer and pianist. Mr. Rios explained that Fernando and Leticia had a close relationship and began to live together and help each other because Fernando needed a room, and Leticia needed help doing the chores and getting groceries. Mr. Rios stated that Leticia was active, agile, did not have any problems going up the stairs, and did not complain about aches or pains.

On cross-examination, Mr. Rios testified he did not live in the apartment, but sometimes stayed overnight, and his sister would go to Colombia for a month to take care of their brother but would always return to the apartment in New York.

4

[* 4]

**TESTIMONY OF MARIA LUZ ROJAS TRUJILLO:**

Ms. Trujillo testified that she is Fernando's mother, and Fernando lived with her cousin, Leticia, in the subject apartment for the last 15-16 years until Leticia passed away. Ms. Trujillo testified Fernando moved in with Leticia because she told her sister Isabelita that she did not want to live alone and wanted Fernando, who she was very close to move with her in the subject apartment, and Fernando wanted to live in Manhattan.

Ms. Trujillo explained that Leticia was her cousin, and her father was the youngest brother of Leticia's mother, Aunt Graciela, making them second cousins. Leticia had seven siblings, several of whom passed away after Leticia's death. Ms. Trujillo testified Leticia would periodically visit her brother in Colombia and sister in Florida but always knew her to live in the apartment on East 83rd Street. Ms. Trujillo further testified from 2010 to 2015, she visited the apartment monthly, eating pizza and drinking wine with Leticia and Fernando and from 2015 to 2021, she would walk a bit in the park with them on Sunday afternoons and Maryna, Fernando's ex-wife who lived in the apartment for three years, also joined their walks.

Ms. Trujillo stated that she has lived on Long Island for fifteen years, from 2010 to 2015, she and her cousin, Gabriel, would visit Leticia and Fernando and from 2015 to 2021, they would visit them regularly, once or twice every two months and spent Thanksgiving, and the day after Christmas with them in the apartment. Ms. Trujillo testified Fernando loved Leticia, and they had a good relationship, like mother and son, and understood each other. Letitia had no children and was very attentive to Fernando cooking for him and making him coffee, and she gave him good advice. Fernando was excellent company, Ms. Trujillo testified, because she did not want to live alone. Ms. Trujillo stated she was a strict mother to Fernando and appreciated Leticia and Fernando's close, affectionate relationship and since Leticia passed away Fernando has felt empty and lonely.

On cross-examination, Ms. Rojas testified Ms. Rios did not confer with her when she went to Colombia or Florida where she owned property with her sister Isabel, but respondent would tell her when Ms. Rios away. Ms. Rojas was not sure of the exact year they Ms. Rios and her sister purchased the property but recalled she would visit Isabel for two weeks at a time.

**TESTIMONY OF PATRICIA HERRERA:**

Ms. Herrera testified that she met Leticia in 1999 and visited the premises but could not say how often and believed Ms. Rios and Mr. Trujillo lived together and described their relationship as loving, like a mother and son. Ms. Rios would prepare food for Mr. Trujillo who would help her. On cross-examination, Ms. Herrera testified in 2010 she saw Mr. Trujillo and Ms. Rios together about eight to ten times, could not say how many times she saw them together in 2011, and maybe once a year from 1999 to 2000, but she was not sure.

**TESTIMONY OF CARLOS ROJAS TRUJILIO:**

Mr. Trujilo testified that he moved into the subject apartment in 2005 to take care of his aunt, Ana Rios, and they continued to live together for the next two decades until she passed away on June 4, 2021. Ms. Rios was his mother's cousin, who referred to as Aunt Letty. Mr. Trujillo described their relationship as

5

[* 5]

very close, like that of a mother and son because Aunt Letty did not have any children and understood and got along with him better than his biological mother. Ms. Trujillo testified Aunt Letty was very positive, outgoing, active, religious, and liberal, she was his confidant whom he trusted her with his secrets. Respondent further testified he and his Aunty Letty went to church together, grocery shopping, went to eat at restaurants, entertained friends, and family at home, watched the news and movies together like "My Fair Lady" and "The Sound of Music," and attend concerts together. A typical day with Aunt Letty respondent testified, included her making him breakfast including black coffee and visits from family, friends, and neighbors. Mr. Trujillo stated his Aunt Letty got along with his girlfriends and even his ex-wife, Maryna Skliarova, who lived with them for about three years. They celebrated holidays together including Christmas, Thanksgiving, birthdays, and other holidays, attended midnight mass where he would play the organ. From 2015 to 2019 respondent testified, he often took Ms. Rios out to eat including for her birthday on November 12th at her favorite Mexican restaurant on 81st and Second Avenue.

Mr. Trujillo stated that Aunt Letty owned property with her sister Isabel in Florida and brother in Colombia. Throughout the year, respondent testified his Aunt Letty would visit and care for her family members in Florida and Colombia for a few days or weeks but would always return to the apartment in New York because she was also caring for her cousin Anabelle in Queens. Mr. Trujillo stated that during the Covid-19 pandemic, his aunt traveled to Colombia to visit her brother but could not return to New York because of the travel restrictions, and she passed away in Colombia on June 4, 2021.

Mr. Trujillo testified he had a joint account with his aunt, where he deposited and withdrew funds to pay most of the living expenses and they went grocery shopping together to the supermarket on East 81st Street where they would buy Colombian coffee and rice, his aunt would cook for him, they would order food or eat out together but his aunt was also independent and went shopping alone. Respondent was also his aunt's power of attorney because she was scared she would be placed in a nursing home, and she shared details of her health issues with him.

Respondent introduced into evidence Ana Rios' power of attorney dated August 8, 2018 (RB); photographs of Ms. Rios and Mr. Trujillo together (RC, D, F, G, H1, H2, 11, and 12); DMV records dating back to July 11, 2013 listing the subject premises as Mr. Trujillo's address(RK); Mr. Trujillo's voter registration dating back to July 17, 2013 listing the subject premises as his address (RM), Mr. Trujillo's Federal Tax Returns for the years 2015, 2016, 2017, 2018, 2019 & 2020; Mr. Trujillo's Spectrum bills from February 4, 2016 through 2023 (RU); Mr. Trujillo's AT&T bills from December 5, 2011 through 2023 (RV); Mr. Trujillo's Chase Bank Account (RW); Mr. Trujillo's Citibank records from January 2012 through February 2023 (RX); Mr. Trujillo's Best Buy Credit Card Statement from September 16, 2014 through February 2023, (RY); Mr. Trujillo's Con Edison records from February 2014 through February 2023 (RAA); City MD letters dated March 19, 2019 and April 18, 2019 as exhibits(REE & RFF); ICE letter from Homeland Security dated October 26, 2017 (RJJ); DOF Notice dated June 5, 2015 (RKK); Toll letters dated August 27, 2016 and January 2018 (ROO & RPP); Geico Insurance Cards for 6/17/17, 5/9/15, 12/17 and 12/6 (RQQ, RRR, RSS & RTT); Volkswagen registration for 3/15, 4/15 & 4/17 ( RVV, RWW & RXX); DMV records for Ana Rios dated January 1, 1995 listing premises as address as exhibit (RCCC).

**CROSS EXAMINATION OF CARLOS ROJAS TRUJILLO:**

On cross-examination, Mr. Trujillo testified the dining room was used as a second bedroom and his aunt Letty initially slept in the small bedroom off the kitchen, which has a door, but she moved to his room

6

[* 6]

which was closer to the bathroom. Mr. Trujillo stated before he and Maryna lived in the apartment with his aunt after their marriage in 2008, where the rooms were only separated by a curtain, everyone was comfortable with the setup because they all lived there as a family until Mayrna moved out sometime in 2016. Mr. Trujillo testified all three of them lived together as a family despite, Ms. Rios stating in her September 25, 2019, deposition that Mayrna never lived in the premises; respondent believed his aunt was elderly, confused, and felt harassed during the deposition.

Respondent testified he did not recall the specific dates of the photographs of him, and his aunt introduced into evidence and had additional photographs but about eleven years ago, photographs, computers, jewelry, and documents were stolen from the apartment. Respondent stated his aunt did cook breakfast for him and black coffee despite stating in her deposition that she did not cook for him and had no reason to cook for Mr. Trujillo. Again, respondent stated he believed his aunt said otherwise because she was elderly and confused, and the landlord was harassing her during the deposition.

Mr. Trujillo stated that he and his aunt went to mass together every two weeks, and she attended his rehearsals and concerts, most of them with Dr. Young. They would also go shopping together, despite him saying at his deposition that she was very independent. Ms. Rios would visit her cousin in Queens, and he would pick her up because sometimes she lost her way in contrast to respondent's deposition testimony that his aunt was very independent and would travel alone to visit her cousin in Queens and went grocery shopping on her own. Mr. Trujillo stated his aunt wanted to be independent, but she got lost three times, resulting in him calling the police when she got lost on the subway so he would accompany her places.

Mr. Trujilo stated his aunt did own a condominium with her sister Isabel in Florida which they sold in 2018. However, Mr. Trujillo testified Ms. Rios and his aunt did not get along and when she went to Florida she did not always stay with her sister and would stay in a hotel or with friends. Respondent was unsure if his aunt left clothing in the condominium and did not believe his aunt bought furniture for the unit because she was stingy. Mr. Trujillo explained that his Aunt Letty purchased the condo to help her sister financially and emotionally, and she went there for roughly a week or up to a month at a time to care for her sister. Mr. Trujillo testified his aunt also owned a condominium with her brother in Bogota, Colombia, would visit to take care of him and other family members but would return to New York where most of her friends live. Respondent testified from 2014 to 2017, his aunt visited Bogota, but she lived primarily in New York but could not recall when or for how long she visited in 2014 and 2015.

On cross-examination petitioner introduced into evidence the deposition of Mr. Trujillo (P10); the marriage certificate of Mayrna Skliarova and respondent (P11); the certified deed for the condominium owned by Ana Rios and her sister, Maria Isabel Laymond located in Sunny Isles Beach, Florida, purchased in 2003 and documents of the sale (P14 & P15); Ana Rios' Florida identification card issued on March 29, 2004 listing the Florida condo address as her primary residence (P16); State of Florida Tax Homestead Exemptions for Ana Rios for the years 2011 through 2017 (P17 & P18); Ana Rios' ownership of a condominium in Bogota, Colombia and related translated documents (P20 - P28); Ana Rios' subpoenaed Citibank records for the years 2012 through 2017 with the Florida address (P30).

7

[* 7]

**TESTIMONY OF ENZA CUSENZA:**

Ms. Cusenza testified she has been employed as a branch manager for Citibank for twenty-five years, where in the regular course of business she maintains the database and has access to records and statements. Ms. Cusenza stated the subpoenaed bank records for Ms. Rios shows in October 2017, Ms. Rios changed her home address on her account ending in #1196, from an address in Florida to one in Colombia. The records also showed from May 2014 through January 2018, a majority of her were made in Bogota, Colombia.

**POST TRIAL MEMORANDUMS OF LAW:**

**PETITIONER'S MEMORANDUM OF LAW:**

Petitioner argues it has established its *prima facie* entitlement to a final judgment of possession and respondent has failed to prove he is entitled to succeed to Ana Rios' rent-controlled tenancy. Petitioner argues Mr. Trujillo has not demonstrated that he qualifies as a non-traditional family member entitled to succeed to the tenancy under the Rent Control Laws, 9 NYCRR 2204.6(d)(3)(i). Petitioner argues that the respondent's relationship with the tenant of record was that of a cousin and, therefore, he has not demonstrated "emotional and financial commitment" and an interdependent relationship with the tenant of record, Ana Rios, that would qualify him as a non-traditional family member as defined in the statute.

Petitioner further argues respondent did not prove, pursuant to 9NYCCR 2204.6(d)(1) that he simultaneously and primarily resided with the tenant of record, Ana Rios, two years before her vacating the subject premises on February 28, 2017. Specifically, petitioner argues while respondent has submitted documentary evidence supporting his residency at the subject premises, he has failed to provide documentation showing that Ana Rios primarily resided and cohabited with him before she vacated the premises on February 28, 2017. Instead, petitioner argues that the documentary evidence shows that Ms. Rios owned a condominium in Florida, was issued a Florida identification card, listed the address of the Florida condominium as her primary residence, and filed for Homestead Exemptions in Florida. The documentary evidence further shows that Ms. Rios also owned a condominium in Colombia, and her Citibank records show that between May 2014 and January 2018, she traveled outside of Colombia on two occasions, once in November 2015 travel to Florida and in May 2017 to New York. In March 2018, while Ms. Rios returned to New York to participate in this proceeding, petitioner argues, she returned to Colombia in December 2019 and remained there until she passed away on June 4, 2021, as a result of the foregoing, petitioner argues, respondent has not satisfied the primary residence requirement under the statute.

**RESPONDENT'S POST-TRIAL MEMORANDUM OF LAW:**

Respondent argues petitioner has failed to meet its burden to prove Ana Rios did not primarily reside in the subject premises. Respondent argues that unlike succession claims that consider the two years before the tenant of record vacated, nonprimary residence claims consider the entire tenancy. Specifically, respondent argues that although Ms. Rios owned two homes, one in Florida and the other in Colombia, and spent time in both places, she did not abandon the subject premises as her primary residence, and her ownership of the two homes is not dispositive of petitioner's nonprimary residence claim. Respondent further argues that the testimonial evidence of respondent's witnesses and Ms. Rios' deposition where she stated that her only doctor was in New York, demonstrated that Ms. Rios did not live anywhere other than

[* 8]

at the subject premises for more than six months. Respondent further argues that because the court declined to substitute Ms. Rios' estate to defend her primary residence claim holding that there was no lease in effect at the time of her death, and any right to possession terminated and automatically reverted to petitioner upon her death, and consequently, respondent as the license of a deceased party is incapable of defending petitioner's nonprimary residence claim. Finally, respondent argues, in the alternative, that he has met his burden that he is a non-traditional family member who primarily resided with the tenant of record Ana Rios for the two years before the date of her death on June 4, 2021, and he is entitled to succeed to the rent-controlled tenancy.

**DECISION:**

Petitioner has proven its *prima facie* case that it is the owner of the subject premises, there is a current multiple dwelling registration for the subject premises, it is properly registered with DHCR, and the last rent-controlled tenant for the subject premises was Ana Rios who passed away during the pendency of this proceeding on June 4, 2021. Petitioner in its Thirty (30) Day Notice of Termination dated January 25, 2017 alleged that Ms. Rios was not occupying the subject premises as her primary residence and upon information and belief in 2003 she purchased a residence in Florida, filed Homestead Exemptions in Florida in 2014, 2015, and 2016, maintained a Florida non-driver's identification card listing the Florida residence as her primary residence, received mail at the Florida residence, and had not been seen at the subject premises, and therefore, petitioner terminated the tenancy as of February 28, 2017.

Mr. Trujillo has raised a claim of succession based upon a non-traditional family relationship which he must prove by a preponderance of the evidence that there was a non-traditional family relationship and he contemporaneously resided with Ms. Rios, in the subject premises as his primary residence for two years, before her tenancy was terminated on February 28, 2017. A succession claim is an affirmative defense, and the burden of proof rests on the party asserting the defense. *Sendowski v. Oilzer,* 47 Misc.3d 142(A), (1st Dept. 2015). The burden of proof is on the occupant seeking succession to prove that he or she cohabited with the tenant as a non-traditional family member for two years prior to the tenant's vacatur. *Cox v. J.D. Realty Assoc.,* 217 AD2d 179 (1st Dept. 1995).

Rent Stabilization provides that "any member of a tenant's family shall not be evicted where the tenant has permanently vacated the housing accommodation and such family member resided with the tenant in the housing accommodation as their primary residence for a period of no less than the two years immediately prior to the permanent vacatur of the housing accommodation by the tenant." 9 NYCRR 2204.6(d), 9 NYCRR 2523.5(b). Where a party provides sufficient proof of a *prima facie* succession claim, the burden shifts to the party opposing succession to rebut the *prima facie* showing contrary evidence. *585 West 204th LLC v. Peralta,* 3d 131(A)(App. Term 1st Dept. 2016).

RSC section 2520.6(o)(2) and *Braschi v. Stahl Associates Co.,* 74 NY2d 201 (1989) expanded the concept of family for rent regulation to include non-traditional family as well as traditional family units. A non-traditional family member is protected from eviction if the individual can establish that there was an emotional and financial commitment and interdependence with the tenant of record. Among the factors a court must consider in making this determination include:

> (i) longevity of the relationship;
> (ii) sharing of or relying upon each other for payment of household or family expenses and/or other everyday necessities of life;

9

(iii) the intermingling of finances as evidenced by, among other things, joint ownership of bank accounts, personal and real property, credit cards, loan obligations, sharing a household budget for purposes of receiving government benefits, etc.;

(iv) engaging in family-type activities by jointly attending family functions, holidays and celebrations, social and recreational activities, etc.;

(v) formalizing legal obligations, intentions, and responsibilities to each other by such means as executing wills naming each other as executor and/or beneficiary, conferring upon each other a power of attorney and/or authority to make healthcare decisions each for the other, entering into a personal relationship contract, making a domestic partnership declaration, or serving as a representative payee for purposes of public health benefits, etc.;

(vi) holding themselves out as family members to other family members, friends, members of the community or religious institutions, or society in general through their words or actions;

(vii) regularly performing family functions, such as caring for each other or each other's extended family members and/or relying upon each other for daily family services;

(viii) ngaging in any other pattern of behavior, agreement, or other action evidences the intention of creating a long-term, emotionally committed relationship.

The absence of documentary evidence does not undermine a succession claim when the totality of the testimonial evidence establishes the requisite emotional and financial commitment. *530 Second Ave. Co., LLC v. Zenker*, 160 AD3d 160 (1st Dept. 2018). Emotional and financial commitment and interdependence are critical in finding a non-traditional family. The factors listed are suggestions and not requirements, as no single factor shall be solely determinative. However, the totality of the relationship, as evidenced by the parties' caring and self-sacrifice, should control. *Braschi v. Stahl*, 74 NY2d 201 (1989).

Here, based upon the documentary evidence and the credible testimony of the witnesses, the relationship between and Ana Rios was like mother and son, qualifying Mr. Trujillo as a non-traditional family member. Although many of the witnesses were family members, they testified Ms. Rios wanted Mr. Trujillo to move in with her because she did not have any children, Mr. Trujillo loved and cared for Ms. Rios, they went grocery shopping together, he would take her out to eat around the city and engaged in family activities including entertaining family and friends in the apartment. The photographs introduced into evidence by respondent confirmed their interaction with family members and eating out together. Mr. Trujillo and Ms. Rios spent holidays together with family and friends, went to church together where Mr. Trujillo sang and played the piano, went for walks in the park together and with family, and watched movies together. Mr. Trujillo testified that he and Ms. Rios had a joint Chase Bank Account but did not intermingle any other finances nor did he testify that they shared household expenses. However, the absence of the intermingling of finances does not negate the conclusion that a family relationship existed. *RHM Estates v. Hampshire*, 18 AD3d 326 (1st Dept. 2005).

The non-traditional family member seeking succession must also prove they co-resided with the tenant of record for the two years immediately before the tenant of record permanently vacated the premises. Respondent argues that Ms. Rios permanently vacated the subject premises on June 4, 2021, the date of her death, and therefore, the requisite period should be the two years prior to June 4, 2021, rather than the date in the Notice of Termination of February 28, 2017. However, when petitioner commenced the case Mr. Trujillo raised a defense of succession, where discovery was conducted including depositions of Mr. Trujillo and Ms. Rios and the requisite period was determined to be the two years immediately prior to the termination of the tenancy on February 28, 2017, and therefore, it would be prejudicial to petitioner if the co-residency period was now changed after eight years of litigation to two-years prior to Ms. Rios' death.

[* 10]

*United E. LLC v. Churi*, 24 Misc.3d 80, 885 N.Y.S.2d 140, 2009 NY Slip Op. 29268. Therefore, Mr Trujillo must prove he co-resided with Ms. Rios from February 28, 2015 through February 28, 2017, the two-year period before she permanently vacated the premises on February 28, 2017.

Rent Stabilization Code Section 2520.6(u) provides a list of factors that may be considered in determining whether an apartment is a person's primary residence. Again, no single factor is determinative. The court considers whether the successor states another address as their residence on tax returns, driver's licenses, motor vehicle registrations, voting records, employment records, and bank and billing records. *Second 82nd Corp. v. Veiders*, 146 AD3rd 696 (1st Dept. 2017). In addition to submitting documentary evidence to demonstrate his residence at the subject premises, respondent must also show that Ms. Rios primarily resided there with him at least two years immediately prior to her vacatur. *Ryan v. New York City Department of Housing Preservation and Development*, 173 A.D.3d 642 (1st Dept. 2019), where "the respondent failed to establish that her father used the subject apartment as his primary residence, let alone that he and petitioner resided there during the two years before he vacated the apartment." *See also*, *Pietropolo v. New York City Dept. of Hosing Preservation, 39* A.D.3d 406, 407 (1st Dept. 2007), where petitioner had the burden to show he resided at the premises with his sister as a primary residence two years prior to her permanent vacatur.

The evidence provided by Mr. Trujillo proved that the subject premises was his primary residence, however, the evidence also showed that Mr. Trujillo did not co-reside with Ms. Rios two years prior to the date of termination of her tenancy or even two years prior to her death. The testimonial and documentary evidence showed that Ms. Rios owned two residences, one in Florida, and the other in Colombia. Respondent also argues that in non-primary residence cases the court can consider the entire tenancy, however, when raising a claim of succession, the person raising the claim must prove that they co-resided with the tenant of record for two years prior to his or her vacatur[1]. Based upon respondent's argument considering the entire tenancy, the evidence shows the subject premises was not Ms. Rios' primary residence for years prior to the commencement of this proceeding. Ms. Rios was issued a Florida non-driver's identification card on March 29, 2004, which expired on November 12, 2020. She filed and signed for Homestead Exemptions on her Florida property from 2011 through 2017, and she listed the Florida home as her primary address on one Citibank account from 2012 through September 2017 before changing it to the address of her property in Colombia in October 2017. Ms. Rios also did not sell the Florida property until 2018, about a year after the commencement of this proceeding. From May 2014 through January 2018, Ms. Rios' debit transactions from her Citibank accounts were in Colombia, except for one transaction in Florida and another in New York. The documentary evidence further shows that respondent was in Bogota in January 2018 and returned to New York in March 2018, to attend court appearances and two depositions on September 25, 2019 and October 18, 2019, and she returned to Colombia in December 2019 and remained there until she passed away on June 4, 2021. Respondent also argues his aunt could not return to New York because of Covid, however, Ms. Rios returned to Colombia after her deposition was completed and remained there until her death in 2021 well after travel restrictions were eased. Respondent further argues the answers Ms. Rios gave during her deposition were because she was elderly and being harassed by petitioner. However, the documentary evidence was clear that Ms. Rios was living in Florida or Colombia.

---

[1] Although respondent had a GAL, they have not raised a claim respondent is disabled and the one year co-residency requirement must be applied.

[* 11]

As a result of the foregoing, the court finds that Ms. Rios did not maintain an ongoing, substantial nexus with the subject premises for actual living purposes. Ms. Rios' ownership of the properties in Florida and Colombia, her filing for Florida Homestead Exemptions, her Florida non-driver's identification, and her Citibank transactions in Florida and Colombia demonstrate that she did not occupy the premises as her primary residence prior to the termination date of February 28, 2017, as set forth in petitioner's Notice of Termination. Further, the witnesses could not confirm dates of when they observed both Ms. Rios and Mr. Trujillo living together in the subject premises from February 28, 2015 through February 28, 2017, nor did she reside there two years prior to her death, as the documentary evidence, particularly her Citibank records show that in December 2019 she returned and remained in Colombia until her death. In addition, Ms. Rios in her deposition stated that while in Colombia she attended church, visited a doctor if she was sick, and kept clothing in Colombia. Therefore, based upon the lack of documentary and testimonial evidence, respondent has failed to prove by a preponderance of the evidence that he and Ms. Rios contemporaneously and primarily resided together in the subject premises for the requisite period.

Accordingly, respondent has failed to prove his defense of succession. Petitioner has proven that the rent-controlled tenant of record, Ana Rios, did not primarily reside at the subject premises, and respondent-undertenant Carlos Trujillo's right to occupy the premises expired upon the termination of her tenancy on February 28, 2017. Final judgment of possession in favor of the petitioner. Issuance of the warrant is forthwith, execution is stayed to April 30, 2025, for the respondent to vacate, leave the apartment in broom-clean condition, and return keys to the petitioner, who will give a dated receipt. Upon default, the warrant may execute upon service of a marshal's notice. The earliest eviction date is May 1, 2025.

This constitutes the decision and order of this court. Petitioner will serve a copy of this order, with Notice of Entry, upon respondent and respondent's counsel by January 25, 2025. The court will mail a copy of this decision/order to both sides and upload a copy to NYSCEF. The parties may retrieve their exhibits in Part S, Room 1164B, which will be held for thirty (30) days.

Dated:   January 15, 2025
         New York, New York

_____
Hon. Norma J. Jennings

Petitioner's counsel:

12

[* 12]